Elizabeth D. SIMMONS, Appellant,

v.

Susan (Vicky) INMAN et al., Respondents.

No. 55227.

Supreme Court of Missouri,
Division No. 1.

Sept. 13, 1971.

Motion for Rehearing or to Transfer to Court
En Banc Denied Oct. 11, 1971.

Robert Martin, William L. Oliver, Jr., Martin, Porter, Pringle, Schell & Fair, Wichita, Kan., Harry A. Morris, James D. Veselich, Morris, Sanders, King & Stamper, Kansas City, for appellant.

Karl F. Schmidt, Carl F. Krauss, Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, for defendant-respondent Jackson County Chapter of the National Foundation—March of Dimes.

James H. Ottman, Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, for defendants-respondents Susan (Vicky) Inman, J. Chester Shimp and Ann Shimp, Ima Phipps, Mrs. Tot Workman, Jean Inman, Sheldon J. Cotton and Anne Cotton, and Willa Mae Powell.

Paul Scott Kelly, Jr., Gage, Tucker, Hodges, Kreamer, Kelly & Varner, Kansas City, for defendant-respondent James Daleo.

James A. Polsinelli, of Romano, Shapiro & Polsinelli, Kansas City, for William Jankowski and Helen Jankowski.

HIGGINS, Commissioner.

Action by twin sister and sole heir at law of testatrix against her unrelated beneficiaries to contest the October 25, 1965, will of Eleanore Miller, deceased. The will devised real estate, and the assets of the estate exceed $75,000 in value. Contestant sought to submit her case on issues of undue influence and testamentary capacity; the court directed a verdict for proponents on the issue of undue influence; verdict and judgment were for proponents on the issue of testamentary capacity, and the dispositive question is whether contestant made a submissible case of undue influence. Accordingly, the evidence will be stated most favorably to con-

testant. McCormack v. Berking, 365 Mo. 913, 290 S.W.2d 145, 146[1].

Specifically, the charge of undue influence as a ground of contest is that the will of Eleanore L. Miller "was executed as a result of undue influence being exercised upon Eleanore L. Miller by the defendant, James Daleo. At the time of the execution of the purported will the defendant, James Daleo, was actively engaged in the practice of law and stood in a fiduciary relationship to Eleanore L. Miller as her attorney. The defendant, James Daleo, was active in the preparation of the purported Will which was prepared in his office and he is named as a substantial beneficiary under the purported will."

Contestant, Elizabeth D. Simmons, and her twin sister, testatrix Eleanore L. Miller, were born December 5, 1912. Eleanore died January 14, 1967, at age 54. Eleanore had neither physical handicaps nor mental impairment until 1930 when she was attacked by spinal meningitis. She was in a coma for a considerable time, during which she could not recognize people or make sounds. After three or four months she was barely conscious and had no memory of the attack. After some sixteen months, she was able to walk but with some permanent impairment or paralysis of her right arm and leg. Her condition improved gradually, but her recollection was poor and she spoke as a child. She attended speech therapy classes and had home tutoring in reading and writing, but never resumed formal education. She was married in 1934 and was divorced shortly after because her husband was unable to tolerate her handicaps.

Dr. Bernard Foster, a neurologist and expert on aphasia,[1] evaluated information from Eleanore's medical history as shown by records of Dickson-Dively Clinic in 1930, Mayo Clinic in 1947, St. Joseph Hospital in 1943, Missouri Baptist Hospital in 1949 and 1952, and from Dr. Doyle Whitman, M.D., of 1951 to 1956. The Dickson-Dively record showed that Eleanore had paralysis of the right side of her body following cerebral spinal meningitis, and Dr. Foster stated that one of the unhappy sequelae of an acute attack of meningitis is damage to the brain. The records of St. Joseph Hospital also showed Eleanore's right-side paralysis and probable Jacksonian seizures indicative of continuing illness. Mayo records showed the beginning of headaches in her right frontal region, also indicative of progressive illness. Such records also showed loss of sensation and paralysis and weakness of the right side, indicative of damage to the left side of the brain. Eleanore's chief complaint on this admission was inability to read, and her neurological examination revealed aphasia. The Missouri Baptist records showed diagnosis by pneumoencephalogram of distal or enlarged ventricle on the left side of the brain, indicative of brain damage and shrinkage. She underwent brain surgery at Missouri Baptist and a biopsy showed progressive brain damage and disease. Dilantin and Mezantoin were prescribed for control of convulsive seizures and she continued the prescriptions through the years. In Dr. Foster's opinion, all this evidence indicated brain damage resulting in personality and character structure changes, all as a result of her spinal meningitis. According to him, in 1965 Eleanore's brain damage, together with her inability to read and learn, would have caused an overall diminution of her intellectual abilities, her impairments would include inability to evaluate herself, and she would be emotionally labile.

Dr. William A. Slentz treated Eleanore only once but saw her about one hundred times from 1957 to 1962 while treating her mother. He could not converse with her and she was unable to assume responsibility for her mother. According to him,

---

1. "Defect or loss of the power of expression by speech, writing or signs, or of comprehending spoken or written language, due to injury or disease of the brain centers." Dorland's Medical Dictionary, 23rd Edition.

Eleanore "wasn't all there" and had the mentality of an eight year old.

Eleanore's various disabilities and impairments were substantiated by lay witnesses who were frequently in her company. One such witness, Mildred Chambers, frequently saw Eleanore while an employee of her mother. According to her, Eleanore became upset easily, particularly about money, and she was obsessed with invading the corpus of a trust in which she benefited. In this latter respect, she consulted with her lawyer, James Daleo.

While the mother of Elizabeth and Eleanore was alive, the relationship between the twin sisters was excellent but, following Mrs. Miller's death in 1963, Eleanore turned on her sister and told her she never wished to see her again.

Mr. Daleo had practiced law since 1923. He had handled legal matters for Eleanore's mother and, after the mother's death, he represented Eleanore. He had drawn two prior wills for Eleanore which were substantially the same as the will in contest except for the bequest of real estate to Mr. Daleo. The first will, drawn prior to the mother's death, contained a bequest to Elizabeth. The second will, drawn after the mother's death, contained no provision for Elizabeth. The will in question, executed October 25, 1965, was the first and only will to name Mr. Daleo as a beneficiary.

Joyce Cunningham was a secretary in the law offices of James Daleo for three years ending in July, 1966. Mr. Daleo leased the office suite, subleased office space to other lawyers, Mr. Mahoney, Mr. Cohn, Mr. Simms, and Mr. Beaton, and provided them with her secretarial services. She recognized the will in question and identified her signature as a witness. Eleanore Miller came into the office to sign the will about noon, October 25, 1965. She read what Mrs. Cunningham had typed and then she went with Mrs. Cunningham into Mr. Cohn's office where she executed the will with Mrs. Cunningham

and Mr. Mahoney as witnesses. Mrs. Cunningham had seen Eleanore Miller regularly when she came to see Mr. Daleo. She had noted Eleanore's speech impediment and paralysis. Mrs. Cunningham had typed the will the day previous to its execution. "I had a carbon copy of her will preceding this one in the file at the office. * * * She showed me the changes she wanted to make. I penciled in the changes on the old copy." Prior to that event, Eleanore "came in the office, and went to Mr. Daleo's office. They were together for a few minutes, and I saw them then." Eleanore and Mr. Daleo came out of the office together and Eleanore then approached Mrs. Cunningham. "She showed me the changes she wanted made. She gave me the legal description that needed to be incorporated in one of them, and she left." Mrs. Cunningham put a copy of the executed will in Eleanore's file in Mr. Daleo's office.

Mrs. Chambers accompanied Eleanore to Mr. Daleo's office on three occasions. "She was very unhappy with him, most of the time. * * * he upset her." Mrs. Chambers recalled a conversation on the day Eleanore made the will in question. "She called and invited Dr. Chambers and me to go to the Carriage Club for dinner * * * and we were to go by and pick her up * * *. I went to the sunroom with her and she said, 'I make will, I make will. * * * Give Jimmy duplex.'" When asked why, "She said, 'Well, he wanted it.'"

Eileen S. Larrea also conversed with Eleanore about her lawyer on several occasions. According to her, Eleanore did not like Mr. Daleo and wanted to get another lawyer but could not; Eleanore would never say why she could not get rid of Mr. Daleo.

Anne Alexander stated that Eleanore told her following her mother's death that she was leaving her property to her sister. On one occasion she was visiting Eleanore and was told that Mr. Daleo was coming

by. When Mr. Daleo arrived Mrs. Alexander heard Eleanore tell Mr. Daleo, "Mama left everything to go to Elizabeth after I am gone."

Elizabeth Simmons stated that her sister called her by telephone late one night about a week before her death and told her she had done something bad and was sorry but she had to, and hung up.

James Daleo confirmed the arrangement by which he rented office space and provided secretarial services to other lawyers. As Eleanore's lawyer, he drew a will for her before her mother's death, drew a second will for her after her mother's death, and advised and visited with her on other occasions. "She'd been in my office time and time again." He recalled a conversation in which Eleanore said she wanted to leave him something, but he asserted he had no knowledge of the last will until after Eleanore's death.

The foregoing is but a brief excerpt from the evidence comprising the contestant's case; and, in accordance with the rule, omits any statement of proponents' equally detailed defense which, together, constitutes a 5-volume record. Such excerpt is sufficient, however, to demonstrate a submissible case of undue influence.[2]

■ In Missouri, a presumption arises that the testatrix has been unduly influenced by the beneficiary so charged when the evidence shows: (1) that a confidential or fiduciary relationship existed between the testatrix and beneficiary; (2) that the fiduciary has been given a substantial bequest by the will; and (3) that the fiduciary was active in procuring the execution of the will. Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772; Switzer v. Switzer, Mo., 373 S.W.2d 930; Wilhoit v. Fite, Mo., 341 S.W.2d 806; Clark v. Powell, 351 Mo. 1121, 175 S.W.2d 842. And,

when supported by probative evidence, the presumption makes a prima facie case which does not disappear upon the introduction of rebutting testimony and raises an issue for the jury. Loehr v. Starke, supra; Pulitzer v. Chapman, 337 Mo. 298, 85 S.W.2d 400; Pasternak v. Mashak, Mo. App., 392 S.W.2d 631, 636[3, 4].

■ The first requirement necessary to the presumption of undue influence, the presence of a fiduciary relationship between testatrix and beneficiary, is satisfied in this case by the relationship of lawyer and client, Pasternak v. Mashak, supra; and there is no question that the evidence shows James Daleo to have been Eleanore Miller's lawyer.

The second requirement, a substantial bequest to the fiduciary, is not disputed, and is shown by the will itself, in that it devised "unto James Daleo, an attorney * * * who has befriended me and advised me, my duplex and lot at 3534 Cherry Street, Kansas City, Missouri, legally described as * * *."

The third requirement is more difficult of demonstration because it is rarely a subject of direct evidence; however, it may be proved by circumstantial evidence, Pasternak v. Mashak, supra; McCormack v. Berking, supra, 290 S.W.2d l.c. 151[6].

Several factors have been recognized in determining whether undue influence has been exercised; e. g., evidence of the mental and physical condition of the testatrix bears on her state of mind and susceptibility to undue influence, Wilhoit v. Fite, supra, McCormack v. Berking, supra; evidence of power to influence the testatrix and opportunity of the beneficiary to do so is properly considered, Hammonds v. Hammonds, Mo., 297 S.W.2d 391; Steller v. Steller, Mo., 401 S.W.2d 473; another consideration is whether the will makes an unnatural disposition of property, Meier v.

2. This, of course, is not an expression of opinion on the merits of such issue, because the question is simply whether such issue should have been submitted to the jury. Odom v. Langston, 347 Mo. 1201, 152 S.W.2d 124, 126.

Buchter, 197 Mo. 68, 94 S.W. 883; yet another is whether the bequest to the fiduciary was a sudden change from a former will, McCormack v. Berking, supra, Fowler v. Fowler, 318 Mo. 1078, 2 S.W.2d 707; and the presence of the beneficiary or even the exertion of his influence at the exact moment of execution need not be shown, Steller v. Steller, supra, 401 S.W.2d l.c. 478[4].

Although strenuously disputed, the evidence would permit an inference that Eleanore Miller's physical and mental condition rendered her susceptible to the influence of her attorney, and there is no question that she was in frequent contact with Mr. Daleo as a friend and client for several years prior to execution of the will in question. Such contacts support an inference of Mr. Daleo's opportunity to influence Eleanore. On the day the will was drafted, Eleanore came out of Mr. Daleo's office with a paper containing the legal description of her real estate which she gave to Mr. Daleo's secretary and stated she wanted to change her will to give the property to Mr. Daleo. This was the only change of substance from the previous will and it, as did its predecessor, disinherited testatrix's twin sister and only heir. The will was drawn and executed accordingly; and, after its execution, Eleanore announced to her friend that she did it for Jimmy (Mr. Daleo) because he wanted it. This, coupled with evidence of her dislike for, and her inability to discharge, her lawyer, warrants the inference that Mr. Daleo had the power, as well as the opportunity, to exercise influence. Further support to such inference is the preparation of the will by Mr. Daleo's secretary in circumstances which a jury could find were devoid of advice from a wholly disinterested lawyer or person.

The facts and circumstances stated in support of a presumption of undue influence in this case comport favorably with the evidence held sufficient to make a submissible case of undue influence as dis-

cussed in the cited cases. Hence, the court did err in directing a verdict against contestant on that issue.

Proponents are entitled to hold their verdict on the issue of testamentary capacity, and the judgment is reversed for a new trial on the issue of undue influence. Switzer v. Switzer, supra.

Judgment reversed and cause remanded.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.